# The Rector, Churchwardens, and Vestry of Trinity Church *versus* Watson and Patterson, for the use of William Patterson.

*Testamentary lien created by devise.—Doctrine of liens discussed.*

A general charge on real estate by devise for the payment of debts does not create a testamentary lien of unlimited duration, subject only to the presumption of payment by lapse of time.

ERROR to the Common Pleas of *Lawrence county*.

This was a *scire facias* by Watson and Patterson for use of William Patterson *v.* William Book, Administrator *de bonis non cum testamento annexo* of Arza Andrews, deceased, Alonzo Potter, Bishop of Protestant Episcopal Church of Pennsylvania, and The Rector, Churchwardens and Vestrymen of Trinity Church, requiring them to show cause why the plaintiffs should not have execution of judgment at No. 48 December Term 1857, against the land of which Azra Andrews died seised.

The rector, churchwardens, and vestry appeared and entered the plea of payment, and that the judgment sought to be recovered was no lien on the land held by them, &c.

[Trinity Church v. Watson.]

It was agreed by counsel for the parties, that Watson and Patterson for the use of William Patterson, had recovered a judgment at No. 48 December Term 1857, on the 15th February 1860, for $118.17, and $22.32 costs against Azra Andrews. That no suit had been commenced for the recovery of the same during the period of five years after the death of said Azra Andrews; and that the lien of said debt had expired under the Act of Assembly, unless it were continued by virtue of the provisions of the last will and testament of said Andrews. That said Azra Andrews died seised of lot No. 1, in the borough of New Castle, which is now claimed by the said Trinity Church, and that the following are all the provisions of the said will and testament which relate to this case :—

"1st. I direct that all my debts and funeral expenses be paid as soon after my decease as possible, out of the first moneys that shall come into the hands of my executor."

"I do further direct that the following named persons, or their heirs, &c., be notified that any reasonable claim they may have against me will be paid, and that this notice shall be served on such individually, to wit :" (here followed a list of names, but Watson and Patterson were not included,) "all other creditors to be notified in the usual way."    "To pay the debts, I desire that all my personal property that my wife shall be willing to part with (and no more) be sold; and if more money be needed, that so much of my real estate, either in New Castle, Pennsylvania, or in Meriden, Connecticut, as may be thought expedient, be sold, as will raise the money to pay my debts."

He then gave the property to his widow for life, and proceeded: "On the decease of my dearly beloved wife, I bequeath the property in New Castle, being lot No. 1, or what may remain after my debts are paid, to the Rt. Rev. Alonzo Potter and his successors in the bishopric of the Protestant Episcopal Church of Pennsylvania, in trust for the Vestry, Rector, and Churchwardens of Trinity Church, New Castle." His wife was appointed executrix.

The personal property of deceased was inventoried at less than $100, and was taken by the widow who died soon after. In an application, subsequently made to the Orphans' Court, for an order to sell lot No. 1, debts amounting to over $700 were returned.

These facts being agreed upon, it was submitted to the court to decide whether the lien of the debt of Watson and Patterson would continue longer than five years.

The court below (JOHNSON, P. J.) delivered the following opinion :—

"A single question is presented—whether the judgment referred to is a lien upon the land described as Lot No. 1, in the borough of New Castle. It is admitted that Azra Andrews died seised,

and that no suit was brought for the recovery of the debt, although past due, until more than five years had elapsed after the death of the testator, under whose will, probated May 29th 1852, the defendants claim the land exempt from this debt. The single question of whether the debt has lost its lien by the bar of the statute requiring all debts of a decedent to be filed of record or prosecuted within five years, depends entirely upon the construction to be given to the will of Azra Andrews.

" In Alexander v. McMurry, 8 Watts 504, the principle was clearly enunciated, that when executors are directed by will to sell land for the payment of debts, this creates a trust of the land for that purpose, and the limitation of the Act of 1794, then in force, did not apply.

" It is based upon the hypothesis that the debts are thereby made a charge upon the land, and all subsequent devises of it are subordinate to, and contingent upon, the existence of a residue after payment of the debts. These views are still more pointedly expressed in Steele v. Henry, 9 Watts 528, in which the will of the testator simply gives power to the executors in the most general terms, 'to sell or convey the whole or any part of my real estate, for the purpose of paying all my just debts.' The same construction was given to the will of Thomas Grant in Baldy v. Brady, 3 Harris 111, in which the power to sell was given in these words: 'to sell all such parts of my real estate (except my mansion farm) as may be necessary to pay my debts.' In giving interpretation to this will the court says: 'The administrator, with respect to those lands, and the money raised by their sale, would be considered a trustee for the creditors, and bound to apply them or their proceeds, when he sold them, to judgments, the lien of which had not been regularly preserved, until they are barred by legal presumption of payment.'

" To pass over the clear recognition of this principle in Agnew v. Fetterman, 4 Barr 56, Hall v. Boyd, 6 Id. 267, and Bank v. Donaldson, 7 W. & S. 407, we find the same construction carried through later cases down to the present time, without variation or exception.

" Thus in Sprenky v. Lackey, 11 P. L. J. 219, a provision in a will in these words: 'I allow my executors to sell so much of my land as will pay all lawful demands against my estate, if he sees cause, &c.,' was held to make the executor a trustee for the creditors as to all the testator's real estate, and to prevent the operation of the statute as to the lien of his debts thereon.

" So in the case of Shippen's Heirs v. Clapp, 5 Casey 265, and Shippen's Administrators v. Clapp, 12 Id. 89, a similar construction is given to the will of Judge Shippen (one of my estimable predecessors in the Sixth Judicial District), in which it is ruled that when the executors are authorized to sell all or any part of

the testator's real estate for the payment of his debts, this is equivalent, by our law, to a devise of all the land to them for that purpose. This will was made in 1838, and probated in 1839, subsequent to the passage of the present Limitation Act of 1834, and shows that nothing in that act changed the rule then established, as to the dedication of his real estate by a testator to the payment of his debts. The language of Judge Shippen's will was, 'my debts are to be paid, and I authorize and empower my executors to sell all or any part of my real estate, &c.' This, as in all the previous cases, was held to be a charge of the debts upon the land, and such an investment of title in the executors as would enable them to sell and traffic off the testator's lands at pleasure. Of course no statutory limitation would bar the lien of any living debt upon them.

"Still later, in Buehler's Heirs v. Buffington et al., 7 Wright 294, most of the foregoing cases are cited and approved, although shown not to be applicable to the case then under consideration.

"See also Jones's Appeal, in 3 Grant's Cases 250, in which an injunction by the testator to his executors, to prevent the sale of his real estate until his youngest child should attain the age of twenty-one years, unless necessary to pay his lawful debts; and in that case, only so much as should suffice for that purpose, is said—Strong, Justice—to make the executors trustees of the realty—first for the payment of debts, and then for the discharge of the legacies.

"In the case before us, the testator directs in his will that all his debts be paid; and after appropriating such personal property as his wife should be willing to part with, and no more, to that purpose, he goes on to provide as follows: 'and if more money be needed, that so much of my real estate, either in New Castle, Pennsylvania, or in Meriden, Connecticut (as may be thought expedient), shall be sold as will raise the money to pay my debts.'

"In a subsequent clause of his will, in devising the reversion of lot No. 1, in New Castle, after the decease of his wife, to the present claimants, he again recognises its previous hypothecation for the payment of his debts: 'I bequeath my property in New Castle, being lot No. 1, or what may remain after my debts be paid, to the Rt. Rev. Alonzo Potter,' &c.

"In no case cited have I found terms used by any testator more clearly indicative of his intention to charge his real estate, first with the payment of his debts, and to make all subsequent dispositions thereof subservient to that. In none is the power to sell for that specific purpose more clearly bestowed. If this be equivalent to a devise to the executors, with power to sell, and such a devise creates a trust for the benefit of creditors, to which no limitation but that of a legal presumption of payment arising from

lapse of time is applicable, then the testator's land in this case is liable to the payment of any debt not outlawed.

" The language of the court in Steele *v.* Henry is more applicable to this case than the one in which it was uttered—'that not until after his debts shall be paid does he devise any portion of his real estate to any one. Thus the debt in question became a lien upon the real estate of the testator without any limitation annexed either by law or by the will.'

" Charged with the execution of this trust, it was clearly the duty of the executrix to have sold the lot No. 1, in New Castle, for the payment of this debt, if there were no other available funds, and the same duty by Act of Assembly is thrown upon the administrator *cum testamento annexo.* They having neglected this, by the ruling of the court in Alexander *v.* McMurry the creditor has a right to proceed by execution against it, and through the medium of a sheriff's sale to effect the manifest intention of the testator. Judgment for plaintiff and decree accordingly."

Which was the error assigned.

*S. W. Dana* and *D. B. Kurtz,* for plaintiffs in error.

*D. Craig,* for defendants in error.

The opinion of the court was delivered by

AGNEW, J.—This case has arisen since the passage of the Act of 24th February 1834. The devise of the lot to Bishop Potter was subject to a general direction for the payment of the testator's debts, referring to nothing to identify the claims of the creditors. The power to sell was given to no one by name or description, vesting in the executor only by operation of law to be exercised under the direction of the Orphans' Court. No suit was brought for the debt until more than five years had expired after the death of the testator.

The proposition maintained in the court below was, that a general charge of real estate for the payment of debts creates a testamentary lien, unfettered by limitation, and subject only to the presumption of payment by lapse of time.

This position is unsupported by authority, while it is clearly contrary to the general doctrine of liens and to the policy of the state.

Alexander *v.* McMurry, 8 Watts 504, the leading case, when properly understood, does not support it. Its true character will be elucidated by a short reference to the views of this court upon the doctrine of liens, especially the lien of the debts of decedents under the Act of 1797.

In Kauffelt *v.* Bower, 7 S. & R. 64, Gibson, J., discussing at length the policy of the state as to liens, said: " The legislature

has uniformly discouraged every other lien or encumbrance than those which arise from transactions which appear of record, and which therefore can prejudice no one who uses proper diligence to ascertain the proper state of the facts, and even where liens are permitted, it has been thought that the state of property, as well as the habits of the people, required them to be laid under severe limitations and restrictions."

In Greenough *v.* Patton, 7 Watts 336, Rogers, J., referring to the multiplication of liens, says—"that their indefinite duration would be productive of the most intolerable mischief. For this reason the legislature and the courts have favoured their limitation by restricting the lien of judgments and other encumbrances."

Justice Kennedy, in Keiffer *v.* Hoch, 1 Watts 9, remarked: "Latent liens are not favoured, and have ever been discouraged with us, where lands have frequently changed their owners in almost as rapid succession as if they had been goods and chattels or merchandise. This doctrine and the policy of it are very clearly illustrated and most powerfully enforced in the case of Kauffelt *v.* Bower, 7 S. & R. 64. Great injustice as well as inconvenience must ever result from secret liens being permitted to continue without limitation *under any circumstances whatever.*"

I have quoted the language of these judges because they are the same who decided Alexander *v.* McMurry, and, following its wake, Steele *v.* Henry, 9 Watts 523. To them I may add Huston, J., in Quigley *v.* Beatty, 4 Watts 13, and Coulter, J., in Maus *v.* Hummel, 1 Jones 228.

In the latter case the judge, remarking upon the course of legislation, said: "The intent of the legislature is not to be doubted. They designed to establish repose and certainty in titles, produce the settlement of estates in a reasonable period, and to free estates from dormant, 'slumbering,' and secret liens. They intended to benefit the heir or devisee, in so far at least as society would be benefited by making estates free for transmission and liable for the debts of the living, who for the third of a century were the apparent owners."

It was under the influence of such views Keiffer *v.* Hoch, 1 Watts 9, Penn *v.* Hamilton, 2 Id. 53, and a long line of cases following in their train, were decided. They rigidly enforced the lien allowed by the Act of 1797, and held that a suit brought within seven years was not alone sufficient, but that the judgment must be kept revived, in analogy to the revival of judgments *inter vivos* under the Act of 1798, otherwise the lien was gone even as to heirs and devisees. In Fetterman *v.* Murphy, 4 Watts 429, Gibson, C. J., who had delivered the opinion in Penn *v.* Hamilton, refers to its purpose as intended "to prevent the mischief which springs from liens of unlimited duration," and remarks, "we

infused into the Act of 1797 for limiting the lien of a decedent's debts, principles borrowed from the Act of 1798 for limiting the lien of judgments."

Alexander *v.* McMurry, and Steele *v.* Henry, must be examined in the light of the views now presented.

The grounds of the opinion of Justice Kennedy can be best stated in his own language. He says: "Here, however, the land in question was given by the testator in charge to his executors, for the purpose of being sold by them, and out of the moneys arising therefrom in the first place to pay his debts and the legacies previously given in his will; thus creating and confiding a trust which they, by taking out letters testamentary from the register, undertook to perform and execute. In order to have discharged the trust thus undertaken by them, they ought to have sold the lands intrusted to them for the payment of the debts and legacies within a year after the testator's death, and to have paid the debts and legacies with the moneys arising therefrom. Neglecting, however, it would seem, to proceed in this way, they were sued by William Morris, a creditor of the testator, *before the year expired*, and a judgment obtained for the amount of his claim within less than three months after the commencement of the suit. The executors, however, notwithstanding this early and complete notice of Morris's debt, which the testator had expressly made a charge upon the land in dispute, still neglected to raise money by a sale thereof, as was their duty, to pay this debt." Again he says: "The executors, or more properly speaking, James and Robert Blaine, who took upon themselves the offices of executors and trustees, were merely entitled to the surplus of the residuary estate, if any should remain after paying the debts and previous legacies; and it is not to be tolerated that any lapse of time should operate in their favour, so as to give them an interest, or to increase it beyond what they would have a right to upon a faithful execution of the trust, short of that which would raise a presumption of the debts and legacies having all been satisfied."

Thus it will be noticed that the limitation of the Act of 1797 never touched upon the debt of Morris; its condition having been complied with, by bringing a suit in season and duly prosecuting it to judgment, and this early notice to the executors, who were both the trustees to sell and the residuary legatees of the proceeds, is specially referred to as a ruling feature of the case. The debt was now a record liability, expiring only upon payment or the presumption of it from lapse of time. But for the decision in Penn *v.* Hamilton, it would now have been an indefinite lien, the Act of 1797 having been satisfied by the performance of its condition, viz. the bringing of suit prosecuted to judgment long before the limitation could visit the debt. The very purpose of the doctrine of Penn *v.* Hamilton was to further limit the lien of the debt,

[Trinity Church v. Watson.]

which must become indefinite by performing the condition of the Act of 1797, and therefore it held that the judgment obtained must be revived within the period of five years after the seven years had run, by *scire facias*, in analogy to the requirement of the Act of 1798. Now we see the true principle of Alexander v. McMurry. What right has a trustee, himself the residuary legatee who has had this early notice of the debt, and whose duty is to sell and to pay the debt, to take advantage of the lapse of time caused by his own postponement of sale and neglect of duty, and thereby put that portion of the proceeds into his own pocket which should have gone to the judgment? Hence the court well said to him, as against you the testamentary charge is sufficient, and you cannot claim that the judgment must be revived. The doctrine of Penn v. Hamilton does not apply to you. Nothing in that case runs counter to the general doctrine of the court and the state policy as to liens. The debt was not secret, the creditor was not negligent, the statutory limitation had not run, and the residuary legatee was estopped by his own laches.

Steele v. Henry needs not to be closely examined, it differs so little from Alexander v. McMurry. Its fundamental elements are the same, the suit being brought in due time, the judgment several times revived, and the laches of the executors, one of whom had an interest in postponing the sale, being of the most gross kind.

But in the case before us no suit was brought by the creditor until the limitation of the Act of 1834 had closed. Admitting that the duty devolved upon the executor to ask the Orphans' Court for direction to sell under the power, yet no debts had appeared to prompt him, and without legal proof of their existence as a charge on the land, the Orphans' Court would refuse its direction: Puy's Appeal, 8 Watts 253; Blawson's Estate, 1 W. & S. 315; Brown v. Phillips, 9 Id. 21; Sample v. Barr, 1 Casey 457; Soles v. Hickman, 5 Id. 342. Nine years elapsed had given the devisee an assurance that he might improve his property or sell it without danger from encumbrances. It is clearly the case of a dormant secret lien so much reprobated by the same judges who decided Alexander v. McMurry and Steele v. Henry. It has not a single feature to liken it to those cases. Then we should not be astute to carry their principle beyond their scope, and the views of those who decided them. We should accomplish no good end, but run directly counter to the plain intention of the Act of 1834, and the views of this court upon it as evidenced in the cases of Sample v. Barr, 1 Casey 457, Soles v. Hickman, 5 Id. 342, Walthour's Heirs v. Gosser, 8 Id. 259, and McGlaughlin v. McCumber, 12 Id. 14. Indeed, I think that Sample v. Barr in effect decides this case. That was a case where the devise was of that part of the testator's land which should remain after payment of his debts. This court held that the debt must be enforced

by suit against the devisee, otherwise his title was unaffected. In the argument the counsel put the case expressly upon the trust, citing Alexander *v.* McMurry and Steele *v.* Henry. Justice Woodward, after stating the devise subject to payment of debts, says, "that is generally the case, but to assume the existence of the debt which the statute says shall be proved, and then to argue that the will devised only what remained after the payment of debts, is to sacrifice the statute to a *petitio principii.*" Now I take it to be a settled principle that every terre-tenant of an encumbered estate can take advantage of the expiration of the lien of the encumbrance and plead it in bar of the recovery of the debt. It is on this principle the Orphans' Court acts in refusing to order a sale for payment of debts where the lien has expired.

In McGlaughlin *v.* McCumber, Justice Thompson remarks, relative to the Act of 1834: "Not only was the extent of the duration of the lien changed by this act, but, by express provision, an implication that the lien might be continued by executions on the first judgment, as had often been held to be the case under the Act of 1798 regulating liens *inter vivos*, and as had been applied in Steele *v.* Henry, 9 Watts 523, and Payne *v.* Craft, 7 W. & S. 458, to cases of decedents' estates, was clearly forbidden by the express declaration that the lien shall not be continued against the real estate of the decedent unless revived by *scire facias* every five years."

It is true there is a trust, and the devisee takes nothing till the creditor is paid. But the title of the creditor to be let in upon the trust lies in his debt, and his relation to the trust is indefinite and unknown until this title be shown. But in doing this, clearly his debt is subject to the law which regulates its recovery. The very feature which distinguishes the debt here is its indefinite, secret, and dormant character, requiring it to be individuated by proof to give it a title to participate in the trust.

Nor is there that inferior merit in the devisee apparently imported by the trust and the prior right of the creditor, which should deprive him of the protection of the statute. He is often the chief object of the testator's regard, who frequently supposes his debts to be few, and that a large surplus will remain. How often men take no account of their debts of suretyship, and of liabilities which are uncertain and contingent? They become bound for administrators, heirs, tellers, treasurers, and public officers; and in bonds of indemnity, covenants for title, and other contingent debts which, after death, rise to derange their plans, and strip their families of their bounty. Take away the protection of the limitation of the Act of 1834, and see what consequences must follow. Wills frustrated, expectations disappointed, and families ruined by old and long-dormant claims. The title thus subject to unknown encumbrances becomes embarrassed, and pro-

perty can neither be improved nor sold by the devisee. A contingent liability may lie for years before the breach occurs, a question is then presented whether its indefinite and contingent character as a lien was divested by a sale. The case falls clearly within the very letter and spirit of the Act of 1834. Then why should its requirement of suit or copy, filed within five years, be repealed by the mere reasoning of Alexander v. McMurry, when the judgment there, which is the only precedent, was founded upon a case where the very letter of the act had been complied with ? Had the naked case of a secret lien, lying dormant in the drawer of the creditor for nine years after the testator's death, been presented to the eminent judge who decided that case, he would not for a moment have held that it was a continuing lien without suit. Its glaring inconsistency with his own views and those of his brethren would have brought him to a different result. But there the Act of 1797 being satisfied by an *early* suit, he sought only to distinguish the case from Penn v. Hamilton, requiring the *judgment* to be revived, and he found in the charge of the debt by the will the due notice of the debt, and the laches of the executor himself, the legatee of the fund, a sufficient distinction. But this will not excuse a dormant creditor, and enable him by the charge in the will to embarrass the property, defeat the public policy, and postpone showing title to the trust until the grave has closed over the proofs which would have blown his debt away. Upon this theory of testatorial power to defeat the express words of the law, a bond or note under seal exhumed for the occasion before twenty years have expired, may sweep away the improvements and labour of years.

The other cases cited by the learned judge below have but little bearing, their use being rather as a recognition of the principles of Alexander v. McMurry and Steele v. Henry. Bank v. Donaldson, 7 W. & S. 407, was a case of *legacies* charged and not a debt, and no question of time arose. Cook's Appeal, 8 Barr 508, and Baldy v. Baldy, 3 Harris 103, arose under the same will, and were decided on the ground that the fund in court was not the subject of the charge. In the former, one ground also was, that the Act of 1797 had not been followed, and in the latter the Greenough judgment was obtained within seven years. Shippen's Heirs v. Clapp, 5 Casey 265, and Shippen's Executors v. Clapp, 12 Id. 89, have no application. In Hare v. Boyd, 6 Barr 267, the decision was against the debt as stale by lapse of time, and because the judgment confessed by one of the executors more than thirty years after the testator's death, was void against the co-executors and the estate. Referring to Alexander v. McMurry, Justice Coulter remarked: " The decision goes on the ground that the executors were guilty of laches and gross negligence in not selling the property and performing the trust confided to them

by the testator, and that such negligence ought not to prejudice the creditor."

In Agnew *v.* Fetterman, 4 Barr 56, Gibson, C. J., referred to Alexander *v.* McMurry and Steele *v.* Henry, not to support but to distinguish them from the case in hand, while the spirit of his opinion is adverse to the doctrine of testamentary liens. Buehler's Heirs *v.* Buffington, 7 Wright 278, was decided against the debt under the terms of the will; and Lowrie, C. J., strongly intimates, upon general principles, that a chancellor in treating a devise as a trust for creditors would respect a statute that fixed a time for the presentation and pursuit of such debts, and would not entertain a bill coming after that period. No case brought to my notice, or of which I have any knowledge, has ever decided that a general direction to sell real estate for the payment of debts, not ascertained or identified, will extend the lien of these debts indefinitely, without suit or notice by filing a copy under the Act of 1834.

A reference to the legislation on this subject will show that this act was intended to restrict the lien of debts more rigidly and to a greater extent than was done by the Act of 1797. That law declared that no debts, except they be secured by mortgage, judgment, *recognisance, or some other record,* should remain a lien longer than *seven* years, unless an action be commenced or a copy or statement filed if the debt be not due; and it excepted *married women, minors, and persons insane, in prison, and out of the United States.* The preamble set forth in brief but well-expressed terms, " the impolicy of indefinite liens whereby *bonâ fide* purchasers may be injured and titles become insecure." This impolicy took fast hold of the legislative mind in passing the Act of 1834. In the 24th section the term of limitation is reduced to five years, recognisances and all record-debts not secured by mortgage or judgment are excluded from the exception; and the proviso as to married women, minors, &c., is dropped.

The revisers in their report (2d Park and Johns. Dig. 756) suggest that the term of five years is ample and harmonizes with the law regulating the lien of judgments. Recognisances they say are omitted in conformity with a decision of the Supreme Court, and what they conceived to be the view of the legislature. In reference to the exception in favour of married women, minors, &c., they say: " We have also omitted the proviso to the 4th section of the Act of 1797, which continues the lien in certain cases to an extent which we think operates very injuriously for the general interest by impeding the transfer of real estate."

In connection with the 24th section we must read other sections of the Act of 1834. The 34th provides: " In *all* actions against the executors or administrators of a decedent who shall have left real estate, where the plaintiff intends to charge such real estate with the payment of his debts, the widow and heirs or *devisees*

[Trinity Church v. Watson.]

and the guardians of such as are minors, *shall* be made parties thereto." But if the creditor's debt is founded in the paramount trust, which can continue the lien without suit, logically it may be argued that he is not entitled to notice. But this has been answered by Sample *v.* Barr, *ante,* which decides that the creditor is subject to the provision of this section notwithstanding the trust. The 25th section fixes the lien of judgment existing at death, at the same period of five years, and requires the lien to be continued by revival. A record-debt, therefore, will lose its lien as between it and other lien-creditors unless revived. Now it would be a most absurd anomaly, that unrecorded, unknown, and dormant debts should have their lien continued by the dash of a testator's pen, while record-liens must be preserved by process, in order to maintain their place beside other creditors. The 42d section of the Act of 1834 exempts real estate from the lien of debts upon a sale in partition made two years after the granting of the letters upon the estate. The 52d section of the Act of 16th July 1842 applies the favourite legislative period of five years to debts, when the proceeds of a sale for distribution are taken to pay them. These provisions furnish strong analogies and exhibit the determination of the legislature to fix a limit to the encumbrances upon the real estate of a decedent. In the light of all these provisions and the judicial decisions upon them, let us read the language of the 24th section of the Act of 1834. It is peremptory and general. " *No debts* of a decedent, except they be secured by mortgage or judgment, *shall* remain a lien on real estate for a longer period than five years after the decease of such debtors unless. an action for the recovery," &c. It seems to me it is not possible to find language which expresses more clearly the legislative intent to bring all debts to the test of this limitation, else why the exception of mortgage and judgment debts. By what authority can we interpolate another exception ?

On no principle of sound reason, state policy, or legislative intent, can we find a distinction between a creditor standing upon nothing but a general direction for the payment of debts and any other creditor whose lien expires in five years. The Act of 1834 was passed to curb all liens of record or not, and why, upon the mere reasoning of cases decided before its passage, suffer a door to be opened to the intrusion of unknown and unnumbered liens, raked up from the ashes of the past within the period of twenty years.

If it be asked why distinguish between a devise for specified debts and one generally for creditors, I answer, that the former are equivalent to legacies charged upon the land, indeed to the devise of the land itself to the creditor, who being thus known and recognised by the testator, stands in no need of proof of his debt, which can be ascertained and removed by payment

14 Wr.—34

or sale. He is well-known and upon equal footing with the devisee of the land; while one who claims but as belonging to a class is neither known nor recognised even by the will, except upon proof that he belongs to the class. His case is clearly adversary until he has maintained his right to seat himself upon the trust. He falls within the mischief the Act of 1834 intended to remedy, and should be governed by its terms which literally include him.

The judgment must be reversed, and judgment entered here for the defendants in the court below.